IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v | : | Crim. No 11-143-01 (RCL) |
| | : | |
| FRANCISCO CARBAJAL FLORES | : | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant Francisco Carbajal Flores, through undersigned counsel, respectfully submit the following memorandum in aid of sentencing:

I. INTRODUCTION

1. Defendant came voluntarily to the United States to assist the United States government in the prosecution of this case. On June 2, 2011, Defendant was arraigned on a four count indictment charging him with one count each of accessory after the fact to the murder of an officer of the United States, accessory after the fact to the attempted murder of an officer of the United States, accessory after the fact to the attempted murder of an internationally protected person, and accessory after the fact to using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence causing death.

2. The charges arise out of the February 15, 2011 armed assault on two United States Immigration and Customs Enforcement officers on a highway in Mexico, which resulted in the death of Special Agent Jaime Zapata and the grave wounding of Special Agent Victor Avila. Defendant did not participate in the crimes, but was part of the

1

organization to which the assailants belonged, the Zetas, an extremely violent Mexican cartel.

3. On January 10, 2012, pursuant to a cooperation plea agreement, Defendant entered a guilty plea to a three-count Criminal Information charging him with: (1) conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d); (2) accessory after the fact to the murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 3, 1114 and 1111; and (3) accessory after the fact to the attempted murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 3, 1114 and 1113. Sentencing is set for Tuesday, November 7, 2017 at 10:00.

4. There was a draft Presentence Reports (PSR) prepared in this case in 2015, ("2015 PSR"). It calculated a Sentencing Guideline offense level of 30, taking into account reductions of 3 level for acceptance of responsibility. The current PSR arrives at offense level of 40, taking into the same reduction for acceptance of responsibility. The parties disagree as to which analytic framework is correct. The government agrees with the current PSR, (Doc. 44 at 11) while Defendant contends in section II below that the initial 2015 PSR contained the correct analysis.

5. Defendant discusses the impact of his cooperation with the government in section III below and also in a sealed portion filed separately. Defendant also attaches a letter he has prepared for the Court. Finally, In Section IV, Defendant addresses several administrative aspects of his sentencing.

II. Objections to Sentencing Guideline Calculations

    A. Determining The Relevant Underlying Offenses

    5. The difference between Defendant and the PSR as to the resulting offense level stems primarily from the issue as to whether the murder of a Mexican national in Mexico by a Mexican national can qualify as a racketeering offense. Defendant pleaded guilty to a violation of 18 U.S.C. §1962(d), Conspiracy to Conduct the Affairs of an Enterprise through a Pattern of Racketeering Activity (hereinafter "RICO"). The controlling Sentencing Guideline, USSG §2E1.1(a) provides that the Base Offense level should be the greater of the "(1) 19; or (2) the offense level applicable to the underlying racketeering activity." The Application Note 1 to this Guideline provides "(w)here there is more than one underlying offense, treat each underlying offense as if contained in separate count of conviction for purposes of subsection (a)(2)."

    6. The 2015 PSR determined there were three underlying racketeering offenses – (1) Accessory After The Fact to the Murder of Agent Zapata, (2) Accessory After The Fact to the Attempted Murder of Agent Avila, and (3) distribution / importation of 5 kilograms or more of cocaine and 1,000 kilograms or more of marijuana. Since being a accessory after the fact to the murder of Agent Zapata and the attempted murder of Agent Avila were also separate counts, the 2015 PSR grouped each one with the related racketeering activity within the RICO count, but not with each other as they involved separate victims.

    7. The 2015 PSR concluded that the offense level for each underlying offense was 30. It concluded that Group One involving the murder of Agent Zapata and Group

Two involving the attempted murder of Agent Avila were each capped at Level 30 due to the operation of USSG §2X3.1(a)(3)(A). The 2015 PSR calculated the drug trafficking racketeering offense as also a level 30 under USSG §2D1.1. Because each of the three offenses had an offense level of 30, under the calculations of USSG §3D1.4, the overall offense level would be 33. The 2015 PSR recognized that Defendant was entitled to a reduction of three levels due to his acceptance of responsibility, resulting in an offense level of 30. With a criminal history Category of I, the applicable sentencing range would be 97 to 121 months.[1]

    8. The 2017 PSR basically agrees with the analysis of the 2015 PSR with respect to the three racketeering activities identified in that PSR. (PSR ¶¶ 74-75, 78-91, 99-105) [2] It arrives at a much higher offense level, however, because it concludes that the RICO Count includes a *fourth* underlying offense – the murder in Mexico of a victim kidnapped by the Zetas. [PSR ¶¶ 73, 92-98, 106-113]. Defendant does not dispute involvement in this murder and other crimes of violence in Mexico; however, the murder or kidnapping of a Mexican national in Mexico by another Mexican national *is not a violation of United States law. See, United States v. Furlong,* 18 U.S. 184, 197 (1820) (murder committed by a foreigner upon another foreigner in another jurisdiction (or vessel of another nation) is not punishable under "universal jurisdiction" as recognized

---

[1] The government did not object or otherwise comment on the 2015 PSR.

[2] The 2017 PSR disagreed slightly with the calculation for the attempted murder racketeering offense. It calculated an offense level of 29, finding that the base offense level was 33 and adding two levels because Agent Avila suffered serious bodily injury. Since USSG §2X3.1(a) provides for capping an accessory after the facts at 6 levels below the offense level for the underlying offense, the actual offense level would be 29. (PSR ¶¶ 85-91) Due to the operation of USSG §3D1.4(a), this *would have no effect on the resulting overall offense level.*

4

under international law, but is to be punished in the affected jurisdiction. *See also, United States v. Bellaizac-Hurtado,* 700 F.3d 1245, 1257 (11th Cir. 2012) ("Uniform condemnation and criminalization does not make something an international crime. Murder and rape, and indeed most *malum in se* offenses, are also universally condemned, and all fall outside of international law," quoting Eugene Kontorovich, <u>Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes,</u> 93 Minn. L. Rev. 1191, 1226 (2009)).

9. Chief Judge Barkett, concurring in *Bellaizac-Hurtado,* 700 F.3d at 1250-1260, explained in more detail:

> Customary international law recognizes five theories of jurisdiction: territorial, protective, national, passive personality, and universality. *See United States v. Benitez*, 741 F.2d 1312, 1316 (11th Cir.1984). The first four theories permit nations to exercise jurisdiction over offenses that implicate domestic interests—that is, offenses that occur within a nation's territory and those that occur outside the territory but have effects within it. In contrast, the universality theory authorizes any nation to exercise jurisdiction over certain offenses, even when no domestic interests are directly implicated. Here, because the drug trafficking occurred outside of United States territory and had no direct impact on the interests of the United States, the only potential basis for jurisdiction is the universality principle. Although the class of offenses that triggers universal jurisdiction has expanded over the last century, the scope of universal jurisdiction remains exceedingly narrow:
>
>> There are two premises underlying universal jurisdiction. The first involves the gravity of the crime. Crimes subject to the universality principle are so threatening to the international community or so heinous in scope and degree that they offend the interest of all humanity, and any state may, as humanity's agent, punish the offender. The second involves the *locus delicti* (place of the act). Crimes subject to the universality principle occur in territory over which no country has jurisdiction or in situations in which the territorial State and State of the

> accused's nationality are unlikely to exercise jurisdiction, because, for example, the perpetrators are State authorities or agents of the State.

Michael P. Scharf, *Application of Treaty–Based Universal Jurisdiction to Nationals of Non–Party States*, 35 New Eng. L.Rev. 363, 368–69 (2001).

10. 18 U.S.C. §1961 (1) defines "racketeering activity." Subsection (A) includes numerous enumerated offense which are punishable under *state* law. The remaining subsections (B) through (G) all refer in some way to violations of *federal* law. Therefore, a violation of purely foreign law cannot be a "racketeering activity." Since the offense level of a RICO charge is capped by the highest "offense level applicable to the underlying *racketeering activity*," there is no *racketeering activity* with an offense level above 30. Thus, Defendant contends that the current PSR is wrong – there is no racketeering offense with an offense level of 43. Thus, he believes that the 2015 PSR is correct and his overall offense level should be 30, and with a criminal history category of I, that should produce a guideline range of 97-121 months.

B. The Impact Of The Plea Agreement

11. The government has correctly noted that the plea agreement contains an agreement that the base offense level would be 43. However, the agreement specifically states that the agreement as to the Sentencing Guidelines is *not binding on either the probation office or the Court*. The agreement identified the underlying racketeering activity as "murder, distribution or importation of a controlled substance, conspiracy to do the same, and accessory after the fact to commit the murder or the attempted murder of an officer or employee of the United States." The agreement did not specify *which*

*murder.* The plea agreement did not attempt to group each individual racketeering activity with other applicable counts as did both the 2015 and 2017 PSRs. Instead, it treated the offense level for the RICO count as one offense and then considered the other two counts as "closely related counts." The analysis in the plea agreement obscured the fact that the murder which purported to give rise to the level 43 offense level was *not* the murder of Agent Zapata.

12. Defendant does not dispute the facts in the Statement of the Offense, to include his killing of the Mexican kidnap victim. He agrees with the general statement in the PSR's response to his objection to the guideline calculation that "murder of individuals for various reasons was common to further the goals of the Zetas," and that the "murder of the kidnap victim in January of 2011 was also in furtherance of the Zetas lucrative drug trafficking operation and was included in the RICO offense to which he pled." (PSR at p.30)[3] These facts, however, do not as a matter of law convert the murder of the kidnap victim into a violation of United States law and thus a racketeering activity.

---

[3] The PSR also suggests that the attack on the American agents was "reasonably foreseeable" in connection with "jointly undertaken criminal activity." There is no evidentiary basis for this assertion. The evidence at trial showed that there was no knowledge that the occupants of the car were American law enforcement agents prior to the attack. There was no evidence that the United States maintained an active law enforcement presence in San Luis Potosi, such that the Zetas would be expected to encounter American agents. Agent Zapata and Agent Avila were based in Mexico City. More importantly, there was no approval - explicit, implicit or even tacit - for Zeta operatives to directly attack American agents. Indeed, it appears that the Zetas took pains to avoid direct conflict with American agents. Zapata Espinosa admitted that he had [messed] up, and there was further evidence that the Zeta commanders had ordered Zapata Espinosa killed for his mistake. In any event, since the indictment specifically charged Defendant with being an accessory after the fact, it would be legally inconsistent argue that he was *also* liable for the murder and attempted murder. *See, Bollenbach v. United States*, 326 U.S. 607, 610–11, (1946) (Accessories after the fact are not principals; the offense is distinct and punished separately.) *Accord, United States v. Irving*, 437 F.2d 649, 650 (D.C. Cir. 1970) (giving the jury, as an example of aiding and abetting, a description of conduct that would be that of an accessory after the fact was error as defendant not charged with accessory after the fact.)

III. THE IMPACT OF DEFENDANT'S COOPERATION

    A. Defendant's Motive To Cooperate

    13. Mr. Carbajal-Flores has prepared a lengthy letter to the Court explaining his background, his involvement with the Zetas and his desire to atone for his participation in the violence perpetrated by them. A copy of an English translation of the letter is attached as Exhibit 1. The original handwritten Spanish version is attached as Exhibit 1A. Mr. Carbajal-Flores also expects to address the Court in person.

    14. In a separate Sealed Portion of this Sentencing Memorandum, Defendant sets forth additional aspects of his desire to cooperate with the United States and Mexican governments.

    B. The Government's Recommendation

    15. The United States has recommended that this Court depart 7 levels downward, (from an offense level of 40) in return for Defendant's cooperation, resulting in an offense level of 33, which with a criminal history category of I, produces a sentencing range of 135 to 168 months. (Doc. 44 at 11) The government further recommends specifically that Defendant receive a total sentence of 144 months (12 years), as follows: Count 1 – 144 months, Count 2 – 144 months, Count 3 -120 months, all sentences to run concurrently. (Doc 44. at 17-19). The government has also submitted a sealed memorandum further explaining the nature of Defendant's cooperation and the government's decision to recommend the departure.

C. Cooperation Resulting In <u>Greater</u> Punishment

16. Unlike the other defendants in this case, Defendant was not extradited to the United States; he came voluntarily. Thus, he arrived without the protections of the extradition process that would prevent him from being tried for offenses not listed in the indictment on which he would have been extradited. As a consequence, the government was legally empowered to charge Defendant not only with being an accessory after the fact to the offenses relating to the attack on the American agents, but also with the broad RICO conspiracy in Count 1, which, in turn, implicated his involvement with other acts of violence and drug trafficking as a member of the Zetas. No other defendant faced *any* increase in his sentencing guideline range as a result of anything besides his role in the attack on the American agents.

17. Had Defendant waited to be extradited on the charges on his indictment, and then taken exactly the kind of plea agreement the other pleading defendants did, a plea to the counts relating to the murder of Agent Zapata and the attempted murder of Agent Avila, with the other charges being dismissed, he would have faced a sentencing guideline range of 29 or 87 – 108 months.[4] This would have been the case, *even if Defendant had received no reduction whatsoever for his cooperation*. Thus, Defendant is facing a significantly higher guideline range simply because he *volunteered* to come to the United States.

---

[4] Because Defendant was only guilty of being an accessory after the fact, each offense would have had an offense level capped at 30 by the operation of USSG §2X3.1(a)(3)(A). Two levels would be added by the multiple count rules of USSG §3D1.4. Three levels would have been reduced due to acceptance of responsibility.

9

IV. OTHER SENTENCING CONSIDERATIONS

    A. Financial Punishments

18. Defendant concedes his responsibility for restitution, although he reserves the right to see the specific documentation of the losses incurred by Agent Avila.[5] (He does *not* dispute a claim for $2,000 in burial costs to the family of Agent Zapata.) Although he has a different case number, he assumes that the eventual restitution claim will be owed jointly and severally with all of the other codefendants.[6]

19. Defendant urges the Court not to impose a fine other than the legally required $100 assessments for each offense. Defendant currently has no meaningful assets, and any future assets he might acquire after release will likely go to pay restitution.

    B. Recommendation As To Location Of Incarceration

20. Defendant requests that this Court recommend to the Bureau of Prisons that Defendant *not* be sent to an institution in Texas, California or the rest of the Southwestern United States. He is concerned that he may encounter someone from the Zetas who might recognize him. Given his having testified against members of the Zetas, he desires that the Justice Department and the Bureau of Prisons work to insure his safety as much as possible.

---

[5] A chart of expenses recently submitted to the government by counsel for Agent Avila now requests $256,906.12, but there is no documentation for any entry or in many cases, even an explanation.
[6] As a practical matter, Defendant might be the only defendant ever able to make any payments other than out of prison pay.

C. Eventual Immigration Disposition

21. Naturally, Defendant hopes that the United States government will not send him back to Mexico after his sentence is complete. Security lapses in the Mexican prison system are, unfortunately, well publicized. Given the enormous scope of the Zeta cartel it is difficult to imagine there is any prison in Mexico that does not have Zeta inmates. The Zeta's reputation for brutally killing individuals suspected of disloyalty (and often their families) is well known also. Defendant views a return to Mexico as a death sentence.

22. In the event that the Department of Security decides not to grant Defendant's wish to remain in the United States, Defendant would ask that the Court impose an additional six month reduction pursuant to *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994)

23. Conversely, in hopes that the Department of Security will grant Defendant's wish to remain in the United States, Defendant requests that the Court recommend that Defendant be permitted to enter the Bureau of Prison's residential drug treatment. Although Defendant has successfully navigated abstinence while incarcerated, the true value to such treatment is in reducing the chances that an individual might relapse upon release when drugs and alcohol are available.

Respectfully submitted

Richard K. Gilbert
Bar. No. 939884
100 "M" Street, S.E.
Suite 600
Washington, D.C.  20003
(202) 749-8627
rkgesq@juno.com

Attorney for Defendant
(Appointed By The Court)